UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BERNADETTE BOZZUTO,                    :
                                        :
        Plaintiff,                      :
                                        :
        v.                              :       CASE NO.  3:16cv964(DFM)
                                        :
CAROLYN COLVIN,                         :
ACTING COMMISSIONER OF                  :
SOCIAL SECURITY,                        :
                                        :
        Defendant.                      :


<u>RULING AND ORDER</u>

The plaintiff, Bernadette Bozzuto, seeks judicial review
pursuant to 42 U.S.C. § 405(g) of a final decision by the
Commissioner of Social Security ("Commissioner") denying her
application for social security disability insurance benefits.
The plaintiff asks the court to reverse the Commissioner's decision
or, alternatively, remand for a rehearing.  (Doc. #14.)  The
Commissioner, in turn, seeks an order affirming the decision.
(Doc. #15.)  For the reasons set forth below, the plaintiff's
motion is denied and the defendant's motion is granted.[1]

I.   <u>Administrative Proceedings</u>

In August 2012, the plaintiff filed an application for social
security disability benefits alleging that she had been disabled

---

[1]This is not a recommended ruling. The parties consented to
the jurisdiction of a magistrate judge and on January 12, 2018,
the case was transferred to the undersigned. (Doc. #20.)

since August 1, 2011, her onset date.[2]  Her date last insured was

August 2013.[3]  (R. at 277.)  The plaintiff's application was denied

initially and upon reconsideration.  She requested a hearing

before an Administrative Law Judge ("ALJ").  On January 20, 2015,

the plaintiff, represented by counsel, testified at the hearing.

A vocational expert and a medical expert also testified.  On

February 25, 2015, the ALJ issued a decision finding that the

plaintiff was not disabled at any time from August 1, 2011, her

alleged onset date, through December 31, 2013, her last date

insured.  (R. at 14-26.)  The ALJ's decision became final on April

28, 2016, when the Appeals Council declined further review.  This

action followed.

II.  Factual Background

The plaintiff, born in 1971, was 40 years old at the time of

her alleged onset date of August 1, 2011.  (R. at 53.)  She has a

---

[2]The onset date is the first day an individual is disabled
as defined in the Social Security Act and the regulations. SSR 83-
20, 1983 WL 31249, at *1 (1983).

[3]To receive social security disability benefits under Title
II, a claimant must demonstrate onset of disability on or before
her date last insured, which in this case is December 31, 2013.
Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008).  "If disability
is not established prior to the date last insured, then the
individual is not eligible for any Social Security disability
benefit payments."  2 Soc. Sec. Disab. Claims Prac. & Proc.
§ 22:251 (2d ed.).

college education and lives with her husband. (R. at 319.) She was last employed in 2008 as a residential counselor in a group home for young boys. (R. at 36, 218.) Before that, she worked as an "ADL specialist" working with adults with mental illness. (R. at 37.) She also was previously employed as a personal trainer.

A. Medical Evidence

The record contains extensive medical evidence predating the plaintiff's August 2011 alleged onset of disability.

2004

In November 2004, the plaintiff saw Dr. Lane Spero, an orthopedist, for complaints of pain in her low back and right hip. (R. at 322.) An MRI of the lumbar spine revealed "L3-4 and L4-5 disc bulges, with small L4-5 annular tear but no evidence of disc herniation or nerve root compression." (R. at 324.) Dr. Spero administered a lumbar epidural steroid injection which provided some relief.

2005

On January 5, 2005, the plaintiff saw gynecologist Dr. Anthony Luciano for complaints of pelvic pain. Dr. Luciano noted that "[a]tlhough the [plaintiff] is being treated as if she had endometriosis," he thought the pain was "mostly non-gynecologic in nature" and recommended that the plaintiff see a rheumatologist.

(R. at 534.)

On January 26, 2005, the plaintiff had a followup appointment with the orthopedist, Dr. Spero. Dr. Spero noted that the plaintiff's "flexion and extension" were "somewhat diminished." (R. at 318.) She had "tenderness over her right buttock in her right sciatic notch," which caused pain down her right leg, stopping at her knee. She had a positive straight leg raise on the right.[4] She had "no pain with range of motion of her hips." Dr. Spero concluded that "[m]otorwise she's completely intact." (R. at 318.)

On February 28, 2005, the plaintiff told Dr. Spero that she had been in a motor vehicle accident and had pain in her left hip, the left side of her neck, and on "the left side of her low back and ribs." (R. at 316.) The plaintiff said she had not been able to work because of the pain. On examination, she had full range of motion of her cervical spine. She had "significant tenderness" over the left side of her back. Dr. Spero observed that the

_____

[4]Straight-leg raising "is a means of diagnosing nerve root compression or impingement, which can be caused by a herniated disc. The patient lies flat while the physician raises the extended leg. If the patient feels pain in the back at certain angles (a 'positive test'), the pain may indicate herniation." Valerio v. Comm'r of Soc. Sec., No. 08CV4253(CPS), 2009 WL 2424211, at *3 (E.D.N.Y. Aug. 6, 2009).

plaintiff had "spasm over her musculature and she does have some pain with ROM [range of motion] of her left hip.  Motorwise in her lower extremities, she is completely intact as well."  (R. at 317.)  Dr. Spero recommended physical therapy and no work for 10 days, commenting that he hoped "she will be ready to go back to work sooner than that."  (R. at 317.)

A week later, the plaintiff told Dr. Spero that her leg pain had improved but that she still had pain in her hip.  (R. at 314.)  Dr. Spero noted that the plaintiff had "some tenderness in her right greater trochanter."[5]  She had no pain with range of motion.  Dr. Spero stated that "neurologically [the plaintiff is] completely intact in her right lower extremity" and that "in terms of her lumbar spine, she doesn't really have any pain with flexion, extension and lateral bending."  (R. at 314.)  He stated that she was "making progress, although it is slow" and recommended physical therapy for her right leg.  (R. at 314.)  Later that month, the plaintiff told Dr. Spero that "the left side of her low back and her left hip" were better but that she had "pain in the left side of her neck and her left scapula."  The pain was "only occasional,"

---

[5]Trochanter refers to either of the two bony protuberances by which muscles are attached to the upper part of the thigh bone. Dorland's Illustrated Medical Dictionary 1996 (31st ed. 2007).

however, and when "she lays down, a lot of the symptoms in her neck and her left scapula feel better." (R. at 312.) On examination, the plaintiff had "full range of motion of both her shoulders"; "her motor exam in both of her upper extremities [was] 5/5;"[6] and "her reflexes were "2+[7] and symmetric at her biceps bilaterally." (R. at 312.) Her left triceps reflex was absent and her right triceps reflex was 2+. (R. at 312.)

In April 2005, Dr. Spero observed that the plaintiff "has significant tenderness from trochanteric bursitis."[8] She had no pain with resisted abduction of her right hip and "motorwise, she's completely intact." (R. at 310.) The plaintiff could heel and

---

[6]Muscle strength is rated on a scale as follows:
0/5: no movement
1/5: trace movement
2/5: movement possible, but not against gravity
3/5: movement with the aid of gravity
4/5: movement possible against some resistance by the examiner
5/5: normal strength.
The Merck Manual 1363 (15th ed. 1987).

[7]Deep tendon reflexes are rated as follows:
0:  no reflex
1+: trace, or seen only with reinforcement
2+: normal
3+: a very brisk response, may or may not be normal
4+: repeating reflex (clonus); abnormal.
H. Kenneth Walker, M.D. et al., Clinical Methods 365 (3rd ed. 1990).

[8]Trochanteric bursitis is inflammation of the bursa at the part of the hip called the greater trochanter. Dorland's Illustrated Medical Dictionary 269 (31st ed. 2007).

toe walk. Her flexion and extension were somewhat diminished. Her motor exam was 5/5 and her reflexes were 2+ and symmetric at the triceps and biceps bilaterally. An MRI of her cervical spine showed some degenerative changes at C4-5 and C5-6 but no disc herniation. (R. at 308, 325.) Dr. Spero recommended physical therapy for her neck and indicated he was "going to keep her out of work until we can get this under better control." (R. at 308.) In May 2005, the plaintiff said her hip was better but "not completely better." (R. at 306.) On examination, Dr. Spero observed that the plaintiff "still had significant tenderness over her greater trochanter." Her gait was normal. (R. at 306.) On June 27, 2005, Dr. Spero noted that the plaintiff had no pain with range of motion with her hip. She had "some mild tenderness. Neurologically, [she] is completely intact. She doesn't have significant pain with resisted abduction." (R. at 302.) On July 18, 2005, Dr. Spero observed that the plaintiff had "good range of motion" and that "[n]eurologically, she is completely intact in both of her upper extremities and her reflexes are intact. In terms of her lower extremities, she has a mildly positive straight leg raise on the left and some pain with range of motion of her left hip. She has some tenderness over her greater trochanter but it is much better." (R. at 300.) Dr. Spero opined that the

plaintiff was "making significant progress with therapy" and could "return to work 4 hours a day, every other day, with no lifting more than 10 lbs." In August 2005, the plaintiff told Dr. Spero that she had not returned to work because her employer did not have light duty work available. Dr. Spero "want[ed] her to continue with light duty" and resume "doing some sort of work." (R. at 298.) When seen in October 2005, she said she had some pain in her right hip but that she "is progressively getting better." (R. at 296.) On examination, she could heel and toe walk "without a problem. Flexion and extension are somewhat diminished. She still has tenderness over her right greater trochanter but motorwise she's intact in both of her lower extremities. She doesn't have any pain with range of motion of her hips." (R. at 296.) In December 2005, the plaintiff reported pain radiating into her left hip. (R. at 294.) Dr. Spero noted that she had significant tenderness over her left sacroiliac joint. She could heel and toe walk without a problem and her flexion and extension were good.

2006

In January 2006, Dr. Spero administered a steroid injection to the plaintiff's left sacroiliac joint. (R. at 293-94.) In March 2006, the plaintiff told Dr. Spero that the injection had

8

been "quite helpful." He thought she was "doing ok" and told her to follow up if the pain returned. (R. at 291.) In September 2006, the plaintiff complained of pain in the left side of her neck, radiating into her ear and jaw. (R. at 289.) She said that her hip pain had not completely resolved but was "definitely livable." Dr. Spero noted that the plaintiff had "pretty good range of motion. It is somewhat diminished, especially with extension. She does not really have any tenderness. Straight leg raising still gives her a little bit of discomfort. Otherwise, she has pretty good range of motion of her hip and her motor exam is 5/5." (R. at 289.) As to her cervical spine, the plaintiff had "pain with extension." Her motor exam was "5/5 including her deltoid, triceps, biceps, wrist extensors/flexors and intrinsics." Dr. Spero assessed her with a 5% partial permanent impairment of her lumbar spine.

2008

On May 22, 2008, the plaintiff was examined by Dr. Joel Geffin, an ophthalmologist, who assessed her with optic neuritis.[9] (R. at 328.)

---

[9]Optic neuritis is inflammation of the optic nerve. Dorland's Illustrated Medical Dictionary 1282 (31st ed. 2007).

2009

In February 2009, the plaintiff was seen by Dr. Kenneth Kaplove, a neurologist.  She told Dr. Kaplove that her right eye was "90% back to full function" and that "it waxes and wanes especially in the heat."  (R. at 339.)  She said she had a tremor "especially with writing or plucking an eyebrow."  Dr. Kaplove found that the plaintiff's muscle strength was "5/5 throughout.  Marginal sustention tremor which dissipates with distraction.  Normal tone and muscle bulk were present in all extremities."  Her reflexes were "2 throughout upper and lower extremities."  Her gait "was normal on heels, toes, tandem, and hopping."  Dr. Kaplove's impression was "recurrent right optic neuritis of unclear etiology; depression; continued word finding problems; celiac disease" and "status post Depo-Provera shots for endometriosis" which he suspected was a possible cause of the optic neuritis.  (R. at 339.)

In June 2009, Dr. Kaplove noted that "[n]europsych testing showed mild cognitive disorder which was felt possibly secondary to pain meds and atypical symptoms of stress."  (R. at 337.)  The plaintiff was advised to reduce her pain medication, take psychiatric medication, and attend counseling.  She disagreed with the test results and declined to pursue the recommendations.

In November 2009, the plaintiff told Dr. Kaplove that she had episodes in the past two weeks of "weakness from the waist down in the low back 1 to 2 times a week lasting 10 seconds" and on one occasion 30 seconds. (R. at 335.) She also complained of back pain and constipation. She slept 4 hours a night and "occasionally during the day." (R. at 335.) Dr. Kaplove noted that the plaintiff was "oriented to person, place and time"; able to name current and past Presidents; able to subtract serial 7s; could spell "world" forward and backward; had 3/3 word recall in 5 minutes; could name, repeat and follow commands; and had an age appropriate fund of knowledge. Her visual acuity was 20/30-1 in her right eye and 20/30 in her left eye. He did not think the plaintiff's "retinal problems" were "related to anything neurologic." (R. at 335.)

2010

On February 26, 2010, the plaintiff was seen by Dr. Wisch, an orthopedist. Three months earlier, Dr. Wisch had performed a "right thumb reconstruction with a mini tightrope."[10] (R. at 348.) Dr. Wisch opined that the plaintiff was "doing great" and could

---

[10]The Mini TightRope technique stabilizes the basilar joint. https://www.arthrex.com/hand-wrist/mini-tightrope-cmc-technique (last visited Aug. 10, 2018).

"go back to work lifting as tolerate[d]."  Noting her prior work as a residential counselor for young boys, he didn't think she should "restrain" anyone because he was "concerned that if she does restraining that her hand may get pulled and it may affect what we have done surgically because she is doing so well."  (R. at 348.)

On March 11, 2010, the plaintiff was seen again by Dr. Kaplove, the neurologist.  On examination, she was able to name current and past Presidents; able to subtract serial 7s; spell "world" forward and backwards; and could recall two out of three words in 5 minutes.  She had normal tone and muscle bulk in all extremities.  (R. at 333.)  Dr. Kaplove's impressions were "status post optic neuritis and multiple other complaints. R/O demyelinating disease.  Constipation and daytime somnolence and pain from fibromyalgia and the medications used to treat it are her major problems . . . . [S]he is having increasing urinary frequency and urgency.  Tremor is an ongoing problem but the medication used to treat it probably would not be tolerated with her low BP and sedation and [the tremor] doesn't seem to functionally impair her."  (R. at 334.)

In a follow up appointment on May 7, 2010 regarding her right thumb, orthopedist Dr. Wisch noted that she was "doing great."

(R. at 346.)

On September 16, 2010, Dr. Kaplove noted that MRIs of the plaintiff's brain, cervical spine, and thoracic spine were negative. (R. at 331.) On examination, she was able to name current and past Presidents; able to subtract serial 7s; spell "world" forward and backwards; and recall two out of three words in 5 minutes. She had normal tone and muscle bulk in all extremities. (R. at 332.) His impressions were "status post optic neuritis; tremor most likely represents essential tremor."[11]

On October 29, 2010, she saw urologist Dr. Joseph Antoci for complaints of urinary urgency and frequency. (R. at 440.) On examination, she was well appearing, in no distress, oriented, and had normal mood and effect. (R. at 442.) He prescribed Vesicare.[12] On November 12, 2010, the plaintiff returned to Dr. Wisch for her right thumb. Her grip strength was the same in both hands. (R. at 344.) Her pinch on the right was 10.5 and 20 on the left. (R. at 344.) Dr. Wisch noted that "[o]nce in awhile she gets a little pain and opined that her thumb was "stable."

---

[11]An essential tremor is a fine-to-coarse slow tremor. The Merck Manual 1946 (20th ed. 2018).

[12]Vesicare is an oral medication used to treat overactive bladder symptoms. Physicians' Desk Reference S-948 (17th ed. 2017).

(R. at 344.)  The plaintiff indicated that she was not working because there were not any jobs in which she would not be required to "restrain" an individual.  (R. at 244.)  Dr. Wisch assessed her with a 20% permanent partial disability of her right thumb.  (R. at 354.)

On December 3, 2010, she told urologist Dr. Antoci that she had stopped taking Vesicare because it caused dry mouth and constipation.  (R. at 437.)  She "also now reports a long history of perineal pain of unknown origin."  (R. at 437.)  A renal ultrasound was normal.  (R. at 438.)

2011

On January 7, 2011, the plaintiff was seen at the Arthritis Center of Connecticut.  She was assessed with cervical and lumbar degenerative disc disease, fibromyalgia syndrome, anxiety, and osteopenia.  (R. at 419.)  She said her pain was a "7 to 8 out of 10."  She was prescribed Percocet, Fentanyl patches, and Xanax.  (R. at 419.)  She was seen monthly thereafter, primarily by Physician Assistant ("PA") Matthew Letko, at which time her prescriptions were renewed.

On February 7, 2011, the plaintiff told urologist Dr. Antoci that her frequency and urgency were unchanged and that she continued to have pelvic pain.  (R. at 434.)  She was diagnosed

with urinary urgency and interstitial cystitis.[13]  (R. at 446.)

On February 10, 2011, the plaintiff was seen by PA Pamela Warren at the office of Dr. Mongelluzzo, the plaintiff's primary care physician.  (R. at 381.)  The plaintiff said she felt "well" and that her "current health is good."  (R. at 381.)  She denied neurological symptoms.  (R. at 382.)  She said she was depressed and was told to increase the dosage of Lexapro from 10 mg to 20 mg.  (R. at 383.)

On April 21, 2011, the plaintiff was seen at Dr. Mongelluzzo's office for sinus congestion and a scratchy throat.  (R. at 377.)  Her neurologic exam was normal.  (R. at 379.)

Notes from the Arthritis Center of Connecticut dated June 2, 2011 described the plaintiff as stable and "doing well with the pain medication.  She has no complaints."  (R. at 413.)

On June 13, 2011, Dr. Mongelluzzo diagnosed her with sinusitis and prescribed an antibiotic.  (R. at 376.)

On July 21, 2011, the plaintiff had a follow up appointment with Dr. Kaplove.  (R. at 364.)  The plaintiff reported chronic right hip pain which she thought was due to endometriosis.  She

---

[13]Interstitial cystitis is inflammation of the bladder that typically causes urinary frequency and pain.  Dorland's Illustrated Medical Dictionary 470 (31st ed. 2007).

was oriented to person, place and time; able to name current and past Presidents; subtract serial 7s; spell "world" forward and backwards; could recall three of three words in 5 minutes; name, repeat, and follow commands. Her motor strength was 5/5 throughout and she had normal tone and muscle bulk in all extremities. (R. at 364.) Her tremor was noted as "mild." Her reflexes were "2-3 throughout in upper and lower extremities." (R. at 365.) Dr. Kaplove noted that although "recent labs raise the possibility of APLS,"[14] the "labs were only mildly high" and "not reconfirmed." In addition, "testing in 2008 was negative." (R. at 365.)

The plaintiff alleges that the onset of her disability was August 1, 2011.

In an August 3, 2011 gynecological appointment, the plaintiff reported that she had celiac disease and had been unsuccessful in following a celiac diet. (R. at 513.)

On September 22, 2011, the plaintiff saw PA Deanna Michaud at Dr. Mongelluzzo's office for ear pain. (R. at 371.) The plaintiff was assessed with sinusitis and otitis media and

───────────────

[14]Antiphospholipid Antibody Syndrome ("APLS") is an autoimmune disorder in which patients have autoantibodies to phospholipid proteins. Anticoagulation is used for prevention and treatment. The Merck Manual 1207 (20th ed. 2018).

prescribed prednisone.  (R. at 373.)  The plaintiff returned in November with the same complaint and was prescribed prednisone. (R. at 368.)

2012

At her January 2012 appointment at the Arthritis Center, the plaintiff reported a "recent flare-up in hip pain" but said that her pain medication gave her an "adequate response."  (R. at 403.) She noted a "[g]eneral improvement in [her] ability to perform activities of daily living."  (R. at 403.)  At a subsequent appointment, Dr. Peck, a rheumatologist at the Arthritis Center, confirmed that the plaintiff did not have APLS.  (R. at 401.)

On March 26, 2012, the plaintiff told PA Letkow at the Arthritis Center that "she's generally been doing well this past month" but had "some episodes of muscle spasm of the upper back." She reported that a decrease in Xanax had reduced her fatigue while her "anxiety remains well controlled."  (R. at 400.)  In April 2012, she reported a "flare-up" as a result of doing yard work. (R. at 398.)  When seen in May 2012, the plaintiff said she was "doing well."  (R. at 399.)  She stated that she experiences "some episodes of exacerbation with increase in activity" but was "managing well with current medication."  (R. at 399.)

On July 16, 2012, the plaintiff saw neurologist Dr. Kaplove.

On examination, she was able to name current and past Presidents; subtract serial 7s; spell "world" forward and backwards; and recall three out of three words in 5 minutes. Her motor strength was 5/5 throughout and she had normal tone and muscle bulk in all extremities. (R. at 362.) Reflexes were 2 throughout in upper and lower extremities. Dr. Kaplove's impression was "status post optic neuritis; stable" and "depression stable." He recommended that she decrease the dosage of Lexapro to 10 mg. (R. at 363.)

When seen at the Arthritis Center on July 18, 2012, the plaintiff said that her medications provided "adequate pain relief." She was assessed as "overall stable." (R. at 396.) The next month, the plaintiff complained of a "flare up" in the past month of "low back pain radiating into her right hip. (R. at 395.) The plaintiff indicated her symptoms were alleviated by exercise and stretching and "exacerbated by an increase in physical activity, prolonged bending and lifting." (R. at 395.)

On September 7, 2012, the plaintiff returned to urologist Dr. Antoci. (R. at 427.) She disclosed that she had stopped taking her medication and Dr. Antoci noted that "not surprisingly her urgency, frequency and pelvic pain are all worse." Dr. Antoci's

assessment was detrusor instability[15] and interstitial cystitis. He prescribed medication. (R. at 429.)

On October 22, 2012, state agency consultant Dr. Rahim Shamsi conducted a psychiatric evaluation for the SSA. The plaintiff told Dr. Shamsi that she has optic neuritis, APLS,[16] arthritis, fibromyalgia, endometriosis, pain in her right hip, anxiety and depression. (R. at 455.) She explained that she last worked as a mental health aide but lost her job when she "developed difficulties with one of her fingers" and was not able to "restrain people." (R. at 455.) She further stated that she suffers from optic neuritis "which has affected her right eye and her vision in her right eye is impaired." According to the plaintiff, she "has been depressed most of her life." (R. at 456.) She denied suicidal ideation. The plaintiff reported that she did some housework but her husband did most of the grocery shopping and cooking. Dr. Shamsi found the plaintiff "was coherent and relevant" and that her affect was mildly anxious and slightly depressed. (R. at 456.) Her present memory was unimpaired. Her

---

[15]Detrusor instability is a syndrome of urinary frequency, urgency and urge incontinence. C.F.I. Jabs & S.L. Stanton, *Urge Incontinence and Detrusor Instability*, 12 INT'L UROGYNECOLOGY J. 58 (2001).

[16] Dr. Peck previously had ruled out APLS, stating categorically that the plaintiff did not have this condition. (R. at 401.)

"past memory even in regard to events in her life occasionally seemed to be vague."  She named past presidents "with difficulty." She was able to add and subtract two digit figures "with difficulty."  She could provide similarities between an apple and a banana but not as to other objects.  She was unable to solve a problem concerning spending money.  She could interpret two proverbs in a very simple manner.  Dr. Shamsi discerned no thought disorder and concluded that she could "understand instructions and get along with supervisors."  He stated that a diagnosis of "major affective disorder, depressed should be considered" and assessed her GAF score as 39.[17]  He thought that the plaintiff could "benefit from psychiatric treatment."

In December 2012, gynecologist Dr. Hakim noted that the plaintiff was on Depo-Provera and "[d]oing well and has no complaints."  (R. at 520.)

_____

[17]A GAF score of 31 - 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed adult avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." Diagnostic and Statistical Manual of Mental Disorders, at 32 (4th ed. 2000)).  The GAF scale was removed from the fifth edition of the DSM published in 2013.

At her January and February 2013 appointments at the Arthritis Center, the plaintiff reported an "increase in diffuse myalgias." (R. at 585-86.) Her anxiety was "stable." In March 2013, the plaintiff reported episodes of "break through/activity-related pain." (R. at 583.)

On March 22, 2013, Dr. Hakim performed a hysterectomy and right salpingo-oophorectomy.[18] (R. at 537.) In a followup examination on March 28, 2013, Dr. Hakim observed that the plaintiff "is going through Percocet as if it is candy. I am very uncomfortable but cannot argue with her now b/c of the surgery. I have no doubt she is addicted to narcotics." (R. at 522.)

When seen at the Arthritis Center in May 2013, the plaintiff reported trying to increase her physical activity. (R. at 582.) She was assessed as "[o]verall stable." July 2013 notes from the Arthritis Center stated that the plaintiff had "no significant complaints at this time." (R. at 597.) She "[r]emains on medication for pain management which she notes contribute[s] to adequate pain relief, thus improvement in performance of ADL's

---

[18]Salpingo-oophorectomy is the removal of the fallopian tube (salpingectomy) and ovary (oophorectomy). Dorland's Illustrated Medical Dictionary 1690 (31st ed. 2007).

[activities of daily living] and overall function." (R. at 597.) The next month, she reported "[r]ecurrent hip pain which she notes has been somewhat aggravated over the past couple of weeks due to long car trips." Her anxiety was assessed as stable. (R. at 596.)

In her September 2013 appointment at the Arthritis Center, the plaintiff complained of a "recent flare-up in discomfort" in her right hip. (R. at 595.) PA Letkow noted tenderness "to palpation overlying the area of the trochanteric bursa" and administered a steroid injection. (R. at 595.) The next month, the plaintiff stated that she "gets generally good pain relief" from her medication. She also said that she "occasionally" has muscle spasms but "gets good relief with Flexeril and heating pads." (R. at 593.)

On November 27, 2013, the plaintiff told PA Letkow that she had an "increase in pain over the right lumbar paraspinal musculature into the buttock." She had "discomfort with prolonged weightbearing and ambulation, and increase in physical activity." (R. at 592.) The next month her pain was assessed as "adequately managed." PA Letko noted that the plaintiff had a history of right trochanteric bursitis that had been treated with steroid injections with "therapeutic benefit" and "general reduction in

pain." (R. at 591.)

The record contains information of medical treatment postdating the plaintiff's last date insured of December 31, 2013.[19]

2014

On March 19, 2014, the plaintiff was examined by rheumatologist Dr. Peck at the Arthritis Center. (R. at 604.) Dr. Peck noted that the plaintiff had "full rotation, extension and flexion" of her neck "without crepitation, pain or tenderness" and her shoulders were "non-tender with full abduction, internal rotation, and external rotation." He noted "[n]umerous tender points throughout the neck and upper back in the locations typical for fibromyalgia syndrome." The plaintiff's elbows had "full range of motion with no tenderness, swelling, or nodularity" and her wrists were "normal with full flexion and extension and no synovitis[20] or local tenderness." The plaintiff's hands were "normal with good grip" with no muscle atrophy or nodules except for age-appropriate osteoarthritis. (R. at 604.) The plaintiff

_____

[19]See footnote 3.

[20]Synovitis is an inflammation of the joint lining, called synovium. Dorland's Illustrated Medical Dictionary 1879 (31st ed. 2007).

23

had decreased range of motion in her back "with tenderness and muscle spasm in lumbar triangles bilaterally." She had "full range of motion" of her hips "without tenderness of the joints or bursae, without crepitation, including flexion and internal and external rotation." She had "full range of motion" of her knees and ankles. Her reflexes in her "biceps, triceps, knee and ankle jerks were 2+ and equal." (R. at 604.)

In April 2014, the plaintiff saw urologist Dr. Antoci for an InterStim placement.[21] (R. at 628.) She subsequently told him that she was "pleased with the results" of the InterStim and that her frequency and urgency had "significantly improved." (R. at 615.) Her "pelvic pain is less frequent, now occurring twice monthly. It is still relatively severe and usually lasts for 1-2 minutes." The plaintiff indicated that she did not want to take medication for this. (R. at 615.)

At her August 2014 appointment at the Arthritis Center, the plaintiff said that her symptoms were "relatively stable" and that she was trying "to remain active." (R. at 598.) In September 2014, the plaintiff had a steroid injection at the "left

---

[21] "The InterStim device is a permanently implanted pulse generator used to treat refractory urgency and frequency." Davis v. Astrue, No. 3:12CV60, 2012 WL 7004421, at *3 (N.D.W.Va. Dec. 3, 2012).

parascapular musculature medial border." (R. at 612.)

2015

In a letter dated January 12, 2015 to plaintiff's counsel, Dr. Phillip Mongelluzzo[22] stated that the plaintiff:

> has a long standing history of multiple diagnos[e]s. These include a history of optic neuritis, which can be an early sign of multiple sclerosis, although we have not definitively diagnosed that. She also has a history of chronic fatigue, depression and anxiety. These diagnos[e]s make it difficult for [the plaintiff] to concentrate and to follow any type of directions in the workplace. She also suffers from chronic hip pain and as such she has a difficult time sitting and standing and moving positions, specifically from a sitting to standing position and vice versa. She also has a history of endometriosis and interstitial cystitis contributing to chronic abdominal pain and pelvic pain. She has issues with her thumb and hand from an arthritis standpoint.
>
> Secondary to the above, she is permanently disabled and not capable of any type of work. She cannot sit or stand for more than 15 minutes at a time. She is incapable of sedentary work due to this fact. She is unable to process multi-step commands due to her lack of concentration associated with her chronic pain, chronic fatigue, anxiety and depression.

(R. at 613.)

B.   Plaintiff's Testimony

At the hearing before the ALJ on January 20, 2015, the

_____

[22]Dr. Mongelluzzo is the plaintiff's primary care physician. The record reflects that she saw him in February 2011 for a checkup, April 2011 for sinus congestion, June 2011 for sinusitis, September and November of 2011 for ear pain. (R. 381, 377, 376, 371, 368.)

plaintiff testified that she was unable to work because of chronic pain. (R. at 37.) She has pain in her neck, back, right hip and abdominal right side. (R. at 38.) The plaintiff explained that she has "a lot of pulling on [her] right side." She has had physical therapy but "nothing seems to really help." (R. at 43.) The pain varies in intensity but is "almost always constant." (R. at 38.) On a daily basis, her average level of pain is 4 - 5 on a scale of 10. (R. at 38.)

The plaintiff testified that she has double vision in both eyes "[m]ost of the time." (R. at 39-40.) She "can't write for long periods of time" and "can't read." Sometimes it affects her driving. (R. at 40.)

She further testified that she has had "17 surgeries on her right [dominant] hand." (R. at 40.) She still has pain. She is unable to "restrain, do repetitive things, no lifting, nothing that involves using it for long periods of time. No writing, no typing." (R. at 41.)

As a result of her interstitial cystitis, "every so often [she] get[s] this really strong pain in the groin area that goes down [her] leg." (R. at 42.) The pain is "almost crippling." (R. at 42.) Surgery helped "the constant urination as well as some of the pain from the interstitial cystitis." (R. at 42.)

The plaintiff said she has difficulty concentrating, remembering, and sleeping. She explained that walking "isn't an issue - It's standing still and sitting that are really aggravating." (R. at 44.) During the day, she lies down for 2 to 5 hours. (R. at 44.) She can no longer do things she likes to do such as snowboarding, skiing, exercising, socializing with friends, and reading. (R. at 45.) She seldomly goes out socially.

C.    <u>Medical Expert</u>

Dr. Stephen Kaplan, a medical expert, reviewed the plaintiff's medical record and testified at the hearing. He stated that the medical evidence indicated episodes of optic neuritis but not double vision. (R. at 47-48.) As to the plaintiff's right hand, Dr. Kaplan noted that the last note from the plaintiff's orthopedist, Dr. Wisch, was from November 2010. At that time, Dr. Wisch observed that the plaintiff's pinch strength was 10.5 on the right and 20 on the left. Her grip strength was the same in both hands. (R. at 344.) Dr. Wisch opined that she could work and the only limitation he ascribed was that she not "restrain" people. Dr. Kaplan observed that as to the plaintiff's urological issues, the InterStim placement in April 2014 significantly improved the plaintiff's urgency and

frequency.  (R. at 49.)  He noted that her pelvic pain "occurr[ed] twice monthly" for which the plaintiff did not wish to take medication.  Dr. Kaplan opined that the plaintiff would be limited to sedentary work as a result of her "chronic pain syndrome or fibromyalgia."  (R. at 50.)

### D.  Vocational Expert

Edmund Colangelo, a vocational expert ("VE"), also testified at the hearing.  (R. at 51.)  The ALJ's inquiry pertained solely to step 4.  He asked the VE about the exertional requirements of the plaintiff's past relevant work.  The VE testified that a mental health worker was medium work, semi-skilled and that the jobs of a group home counselor and personal trainer were light work, skilled.  (R. at 51.)

## III. Statutory Framework

To be "disabled" under the Social Security Act and therefore entitled to benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Commissioner uses the following five-step procedure to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant
> is currently engaged in substantial gainful activity. If
> he is not, the [Commissioner] next considers whether the
> claimant has a "severe impairment" which significantly
> limits his physical or mental ability to do basic work
> activities. If the claimant suffers such an impairment,
> the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed
> in Appendix 1 of the regulations. If the claimant has
> such an impairment, the [Commissioner] will consider him
> disabled without considering vocational factors such as
> age, education, and work experience.... Assuming the
> claimant does not have a listed impairment, the fourth
> inquiry is whether, despite the claimant's severe
> impairment, he has the residual functional capacity to
> perform his past work. Finally, if the claimant is unable
> to perform his past work, the [Commissioner] then
> determines whether there is other work which the
> claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (internal
alterations and citation omitted).   "The applicant bears the
burden of proof in the first four steps of the sequential inquiry;
the Commissioner bears the burden in the last."   Talavera v.
Astrue, 697 F.3d 145, 151 (2d Cir. 2012).

IV.   The ALJ's Decision

Following the five step evaluation process, the ALJ first
found that the plaintiff had not engaged in substantial gainful
activity "from her alleged onset date of August 1, 2011 through
her date last insured of December 31, 2013." (R. at 16.)  At step
two, the ALJ determined that the plaintiff had a severe impairment
of fibromyalgia.   The ALJ concluded that the plaintiff also

suffered from "cervical and lumbar degenerative disc disease; localized arthritis in the primary hand; constipation; optic neuritis; interstitial cystitis; detrusor instability; sinusitis; right trochanteric bursitis; history of sprain of the thumb; history of carpal tunnel syndrome; history of chronic fatigue; status post hysterectomy with a history of endometriosis; affective disorders; and anxiety-related disorders" but that these were non-severe impairments because they would not cause more than a minimal limitation in her ability to perform work-related tasks. (R. at 17.) At step three, the ALJ found that the plaintiff's impairments, either alone or in combination, did not meet or medically equal the severity of a listed impairment in 20 C.F.R. Pt. 404, Subpart P, Appendix 1. (R. at 20.) The ALJ next determined that the plaintiff had

> the residual functional capacity ("RFC")[23] to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a). The claimant would be able to lift and/or carry ten pounds occasionally and less than ten pounds frequently. She could stand and/or walk for two hours in an eight-hour workday. She could sit for six hours in an eight-hour work day.

(R. at 20). At step four, relying on the VE's testimony, the ALJ concluded that the plaintiff was not capable of performing her

---

[23]A claimant's residual functional capacity "is the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1).

past relevant work. (R. at 25.) At step five, after considering plaintiff's age, education, work experience and RFC, and after consulting the Medical-Vocational Guidelines found at 20 C.F.R. Part 404, Subpart P, Appendix 2, the ALJ found that there existed jobs in significant numbers in the national economy that the plaintiff could perform. (R. at 25.) Accordingly, the ALJ determined that the plaintiff was not under a disability "at any time from August 1, 2011, the alleged onset date, through December 31, 2013, the date last insured." (R. at 25.)

V.    Standard of Review

This court's review of the ALJ's decision is limited. "It is not [the court's] function to determine de novo whether [the plaintiff] is disabled." Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996). The court may reverse an ALJ's finding that a plaintiff is not disabled only if the ALJ applied the incorrect legal standards or if the decision is not supported by substantial evidence. Brault v. Soc. Sec. Admin., 683 F.3d 443, 447 (2d Cir. 2012). In determining whether the ALJ's findings "are supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (quoting

<u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1038 (2d Cir. 1983)). "Substantial evidence is more than a mere scintilla. . . . It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Brault</u>, 683 F.3d at 447 (quotation marks and citations omitted). It is "a very deferential standard of review — even more so than the clearly erroneous standard. . . . The substantial evidence standard means once an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." <u>Id.</u> at 447-48. <u>See also</u> <u>Genier v. Astrue</u>, 606 F.3d 46, 49 (2d Cir. 2010) ("Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence.")(internal quotation marks omitted).

VI. <u>Discussion</u>

The plaintiff argues that the ALJ failed to (1) develop the record; (2) assess certain of her impairments as severe at step 2; (3) follow the treating physician rule; and (4) include certain non-exertional limitations in her RFC.

A. <u>Failure to Develop the Record</u>

The plaintiff first argues that the ALJ erred by failing to

develop the record. She contends that several categories of medical evidence are missing.

"[B]y statute, the ALJ [i]s required not only to develop [plaintiff's] complete medical history for at least the twelve-month period prior to the filing of [plaintiff's] application, but also to gather such information for a longer period if there [i]s reason to believe that the information [i]s necessary to reach a decision." DeChirico v. Callahan, 134 F.3d 1177, 1184 (2d Cir. 1998). "Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record. . . . This duty exists even when the claimant is represented by counsel . . . ." Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)(citations omitted). However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (internal quotation marks omitted).

"When an unsuccessful claimant files a civil action on the ground of inadequate development of the record, the issue is whether the missing evidence is significant, and plaintiff bears

the burden of establishing such harmful error." Parker v. Colvin, No. 3:13CV1398(CSH), 2015 WL 928299, at *12 (D. Conn. Mar. 4, 2015) (quotation marks omitted) (collecting cases). See also Santiago v. Astrue, No. 3:10CV937(CFD), 2011 WL 4460206, at *2 (D. Conn. Sept. 27, 2011) ("The plaintiff in the civil action must show that he was harmed by the alleged inadequacy of the record[.]")(citation omitted)).

The plaintiff contends that the ALJ should have obtained information about the plaintiff's prior hand surgeries. She points to her testimony that she has had multiple hand surgeries and asserts that "there is very little evidence relating to her hand surgeries in the record." (Doc. #14 at 11.)

The plaintiff does not articulate how the omission of such evidence affected the ALJ's ability to render a decision. Nor does the record suggest that information about prior procedures would be material. Orthopedist Dr. Wisch treated the plaintiff for her right hand issues and performed various surgical procedures, some of which date back to 2003.[24] (R. at 356-57.) The ALJ had before him Dr. Wisch's 2010 treatment notes, which included a discussion of the plaintiff's final surgical procedure

---

[24]The record contains a 2009 letter from Dr. Duffield Ashmead, a hand surgeon, outlining the history of the plaintiff's surgeries. (R. at 356.)

on her right thumb.  In February 2010, Dr. Wisch cleared her for work with the only limitation that she shouldn't do any "restraining."  (R. at 348.)  When seen in May 2010, Dr. Wisch reiterated that the plaintiff could return to work "full duty, lifting as tolerate[s], no restraining."  (R. at 346.)  In November 2010, he opined that she was "doing very well", her thumb was stable and had "great motion."  (R. at 344.)  At that point, he told her to follow up as needed.  There are no treatment notes from Dr. Wisch after this.  The evidence in the record does not show any functional effects or symptoms related to these prior surgeries and there is no "obvious gap" in the record.  See also Duprey v. Berryhill, No. 3:17CV00607(SALM), 2018 WL 1871451, at *10 (D. Conn. Apr. 19, 2018)("even if the ALJ had erred by failing to request additional records, plaintiff has not met her burden to show such error would be harmful where "[p]laintiff has not established that additional treatment notes would have impacted the ALJ's decision. Accordingly, the Court finds that even if the ALJ had erred, the error would be harmless.")

The plaintiff next asserts that the ALJ should have obtained the "notes" from the plaintiff's "neuropsychological test." (Doc. #14 at 11.)

Here again, the plaintiff has failed to demonstrate that the

purported gap in the record is significant.  She offers no argument as to how her claim was impacted by the absence of the notes and there is no indication that such records would have changed the ALJ's determination.  See Santiago, 2011 WL 4460206, at *2 ("The plaintiff makes only a general argument that any missing records possibly could be significant, if they even exist. That argument is insufficient to carry his burden.").  In June 2009, the plaintiff's treating neurologist, Dr. Kaplove, stated that "neuropsych testing" showed a "mild cognitive disorder" that was "felt possibly to be secondary to pain meds and possibly atypical symptoms of stress."  (R. at 337.)  The ALJ had before him Dr. Kaplove's clinical findings and treatment records from 2009 through 2011, which do not suggest a functional limitation.  The ALJ also had the benefit of Dr. Shamsi's consultative examination. The record was adequate for the ALJ to make a determination as to disability and the ALJ was not required to obtain further information about the test.  See Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996).  Accordingly, the ALJ did not fail to properly develop the record.

The plaintiff next says that her "doctors have noted that she has celiac disease" but that there no evidence regarding "any diagnostic testing or celiac treatment."  (Doc. #14-1 at 11.)

The record contains sporadic references to a diagnosis of celiac disease. The plaintiff does not, however, assert that she underwent any testing or received treatment for this condition. She also does not articulate how her claim was impacted by the purportedly missing records. The ALJ had before him a voluminous, longitudinal record of the plaintiff's medical treatment by a variety of medical providers. Upon careful review, the court finds no indication in the record that the plaintiff was impaired by celiac disease during the period in question -- that is, between her onset date of August 2011 and her date last insured of December 2013 -- that would have obliged the ALJ to develop the record further. See Duprey v. Berryhill, No. 3:17CV00607(SALM), 2018 WL 1871451, at *10 (D. Conn. Apr. 19, 2018)(Plaintiff failed to meet her burden of showing that additional records would have impacted the ALJ's decision).

The plaintiff next argues that the ALJ should have obtained records regarding the plaintiff's optic neuritis. In support, she states that "Dr. Kaplan said that it's likely that the last several years of the medical records relating to [the plaintiff's] optical neuritis are missing." (Doc. #14 at 11.)

The hearing transcript reveals that Dr. Kaplan testified that the plaintiff "has a history of neuritis. We don't have anything

for the last two years in terms of her vision issues.  There is no diplopia[25] indicated in the record."  (R. at 50.)  Dr. Kaplan merely commented on the absence of records relating to the plaintiff's vision issues.  He did not suggest that records exist but were "missing."  Moreover, the plaintiff does not argue that she received treatment for this condition from a provider not included in the record or identify specific records that she claims are missing.  On this record, the ALJ was not required to develop the record any further.

Finally, the plaintiff cursorily suggests that "there appear to be missing neurology records."  (Doc. #14 at 12.)

At the hearing in 2015, the ALJ mentioned that there were no records after July 2012 from Dr. Kaplove, the neurologist, a fact the plaintiff's attorney confirmed.  (R. at 16-17.)  During this colloquy, the plaintiff stated that "I should have gone last year [2014]."

On this record, it is not clear that any records are actually "missing."  In any event, the plaintiff does not explain what this purported missing treatment note (which would postdate her date last insured) would show or how its absence results in an "obvious

---

[25] Diploplia refers to doublevision.  <u>Stedman's Medical Dictionary</u> 547 (28th ed. 2006).

gap" in the administrative record, warranting remand, where Dr. Kaplove's prior treatment notes consistently reflected benign findings.

B.   Step 2

The plaintiff next argues that the ALJ erred at step two by failing to properly assess the severity of certain impairments. (Doc. #14-1 at 12.)

At step two, "[a] claimant has the burden of establishing that [she] has a 'severe impairment,' which is 'any impairment or combination of impairments which significantly limits [her] physical or mental ability to do basic work." Woodmancy v. Colvin, 577 F. App'x 72, 74 (2d Cir. 2014).  "[M]ere diagnosis of an impairment is not sufficient to establish 'severity' under step two." Cobbins v. Comm'r of Soc. Sec., 32 F. Supp. 3d 126, 133 (N.D.N.Y. 2012).

The plaintiff argues that the ALJ should have found that the plaintiff's "hand arthritis" and degenerative disc disease were severe impairments.  In support, she argues that she has had multiple surgical procedures on her hand.  As to her degenerative disc disease, she cites MRI results showing disc bulges at L3-L4 and L4-L5 and a small annular tear at L4-L5 as well as the pain medication she is prescribed.

The ALJ determined that the plaintiff's hand arthritis and disc disease were not severe impairments because the record indicated that they were managed with medication and treatment, "with no ongoing, secondary functional limitations that would cause more than a minimal effect on [her] ability to perform basic, work-related tasks for a period of twelve months or more." (R. at 17.)

Substantial evidence supports the ALJ's determination. The record demonstrates that the plaintiff's symptoms from her arthritis and disc disease lessened with treatment, or have not recurred. Dr. Wisch opined that the plaintiff was "doing great" and could "go back to work lifting as tolerate[d]." (R. at 344, 346, 348.) Notes from the Arthritis Center indicate that the plaintiff was stable and doing well with pain medication. (R. at 405-419.) The record does not indicate that these impairments caused more than a minimal limitation in the ability to do basic work activities.

The plaintiff also argues that the ALJ should have found the plaintiff's affective disorder to be a severe impairment. She points her testimony that she is depressed, anxious, and has lost interest in things. She also says she has difficulty concentrating, remembering, and difficulty sleeping.

The ALJ concluded that the plaintiff's "medically determinable impairments of affective disorders and anxiety-related disorders, considered singly and in combination, did not cause more than minimal limitation in [her] ability to perform basic mental work activities and were therefore non-severe." (R. at 17.) The ALJ determined that the plaintiff had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, and pace, and no episodes of decompensation of extended duration. The ALJ noted that record did not reveal any significant, ongoing mental health treatment. Rather, Dr. Peck, the plaintiff's rheumatologist, prescribed medication for anxiety and depression. The ALJ further observed that the records from the Arthritis Center reflected stable mental health status with adequate relief from medication. (R. at 18.) There are no records indicating limitations arising from these conditions. Substantial evidence supports the ALJ's determination that the plaintiff did not carry her burden of demonstrating that these conditions were severe impairments.

C. <u>Treating Physician</u>

The plaintiff next contends that the ALJ erred in weighing Dr. Mongelluzzo's opinion because the ALJ should have sought

additional treatment records.

"The SSA recognizes a rule of deference to the medical views of a physician who is engaged in the primary treatment of a claimant." Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015)(quotations marks and citations omitted). "[T]the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" Id. (citations omitted). When a treating physician's opinion is not given "controlling" weight, the ALJ considers: the frequency, length, nature, and extent of treatment; the amount of medical evidence supporting the opinion; the consistency of the opinion with the remaining medical evidence; and whether the physician is a specialist. Greek, 802 F.3d at 375. The ALJ must provide "good reasons" for not crediting the opinion of a claimant's treating physician. Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). In light of the ALJ's affirmative duty to develop the administrative record, "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." Rosa v. Callahan, 168 F.3d 72, 79 (2d

Cir. 1999).

Dr. Mongelluzzo's January 2015 opinion stated that the plaintiff has

> a history of optic neuritis, which can be an early sign of multiple sclerosis, although we have not definitively diagnosed that. She also has a history of chronic fatigue, depression and anxiety. These diagnos[e]s make it difficult for [the plaintiff] to concentrate and to follow any type of directions in the workplace. She also suffers from chronic hip pain and as such she has a difficult time sitting and standing and moving positions, specifically from a sitting to standing position and vice versa. She also has a history of endometriosis and interstitial cystitis contributing to chronic abdominal pain and pelvic pain. She has issues with her thumb and hand from an arthritis standpoint.
>     Secondary to the above, she is permanently disabled and not capable of any type of work. She cannot sit or stand for more than 15 minutes at a time. She is incapable of sedentary work due to this fact. She is unable to process multi-step commands due to her lack of concentration associated with her chronic pain, chronic fatigue, anxiety and depression.

(R. at 613.)

The ALJ afforded Dr. Mongelluzzo's opinion "minimal" weight explaining that it lacked "detailed, thorough, ongoing contemporaneous documentation of physical and mental status exams to support the degree of functional limitations described." (R. at 24.) The ALJ also found that Dr. Mongelluzzo's opinion was inconsistent with "the evidence in its entirety." He also noted that "Dr. Mongelluzzo did not opine that the functional limitations related back prior to the date last insured of December 31, 2013

[and] the evidence does not contain treatment records prior to the date last insured from Dr. Mongelluzzo that would support a finding that the assessment related back."   The ALJ added that Dr. Mongelluzzo's opinion that the plaintiff was permanently disabled and incapable of working was conclusory and was an issue reserved to the Commissioner.  (R. at 24.)

The plaintiff raises two challenges to the ALJ's assessment of Dr. Mongelluzzo's opinion.  She first argues that "there is evidence that ample medical records are missing" that the ALJ should have obtained.  (Doc. #14 at 16.)  She posits that "[t]he ALJ cannot fail at his duty to develop the record and then fail to assign weight to the opinion of a treating physician whose records the ALJ failed to acquire."  (Doc. #14 at 15.)

The ALJ did not err.  In March 2013, the plaintiff's attorney requested Dr. Mongelluzzo's records from January 2011 to the "present."[26]   (R. at 367.)   Notwithstanding, the most recent treatment note in the record from Dr. Mongelluzzo is dated November 16, 2011.  (R. at 368.)  The plaintiff does not say that she treated with Dr. Mongelluzzo after this date.  The records from

---

[26] The plaintiff did not list Dr. Mongelluzzo on her application as one of her health care providers.  See R. at 222-225.

his office do not substantiate the debilitating limitations he ascribed to her in his 2015 opinion. In addition, the record contains voluminous records from the plaintiff's neurologist, orthopedist, rheumatologist, gynecologist and urologist. This is not a case involving a "clear gap" in the record. Rosa, 168 F.3d at 79.) The plaintiff's argument that the ALJ should not have discounted Dr. Mongelluzzo's opinion is unavailing.

The plaintiff next says that the ALJ should not have rejected Dr. Mongelluzzo's statement that the plaintiff was disabled. However, it is "well-settled that a treating source's opinion on the ultimate issue of disability is an opinion reserved for the Commissioner." Carlson v. Berryhill, No. 14CV2680(NSR)(LMS), 2018 WL 3300708, at *20 (S.D.N.Y. Jan. 29, 2018). See 20 C.F.R. § 404.1527(d)(1); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("An opinion from a treating source that the claimant is disabled cannot itself be determinative.").

D. Step 5

Although the plaintiff characterizes her final claim as a Step 5 error, the thrust of her argument is that the ALJ erred in determining her RFC and "should have included non-exertional limitations stepping [sic] from [her] chronic pain and mental illness." (Doc. #14 at 18.) In particular, she points to her

testimony that

> she has difficulty concentrating and remembering, and
> difficulty sleeping . . . . [S]he has to lay down during
> the day for between two and four hours. [She] has a
> tremor while writing and while plucking her eyebrows,
> and numbness and tingling in both her knees and arms .
> . . .

(Doc. #14 at 18.) The plaintiff also points to her pain
medications and the neuropsychological test showing a mild
cognitive disorder. (Doc. #14 at 18.) She argues that "[a]ll of
these non-exertional limitations should have been included in the
ALJ's RFC determination." (Doc. #14 at 18.) Had these
limitations been included, the plaintiff contends, the testimony
of a VE would have been required at Step 5.

The plaintiff bears "the burden of proving her RFC."
Kallfelz v. Comm'r of Soc. Sec., No. 3:15CV1494(DFM), 2017 WL
1217089, at *3 (D. Conn. Mar. 31, 2017). "When determining a
claimant's RFC, the ALJ is required to take the claimant's reports
of pain and other limitations into account, but is not required to
accept the claimant's subjective complaints without question; he
may exercise discretion in weighing the credibility of the
claimant's testimony in light of the other evidence in the record."
Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (internal
citations omitted). "The court will not second-guess the ALJ's
decision where he identified the reasons for his RFC determination

and supported his decision with substantial evidence." <u>Kallfelz</u>, 2017 WL 1217089, at *3.

In reaching his RFC determination, the ALJ extensively discussed the evidence of record, including the plaintiff's statements, medical treatment notes, and opinion evidence. (R. 20-24.) As to the plaintiff's subjective complaints, the ALJ determined that the plaintiff's impairments could reasonably be expected to cause her alleged symptoms. He concluded, however, that her statements concerning the intensity, persistence and limiting effects of the symptoms were "not entirely credible to the degree alleged." (R. at 21.)

In so concluding, the ALJ carefully reviewed and recited the medical evidence, noting that the record evidence "reflects generally unremarkable physical exams." (R. at 23.) The numerous treatment notes of the Arthritis Center and Dr. Peck indicated that the plaintiff's pain and aches were adequately managed by medication that the plaintiff tolerated well. Treatment notes from the plaintiff's neurologist reflect intact mental status examinations. (R. at 331, 333, 335, 364.) Consulting examiner Dr. Shamsi discerned no thought disorder and opined that she could "understand instructions and get along with supervisors." As to her tremor, Dr. Kaplove consistently observed that the plaintiff's

47

tremor was mild and did not functionally impair her.  (R. at 334, 364.)  Of note, aside from Dr. Mongelluzzo, none of the plaintiff's physicians provided a source statement indicating any of the non-exertional limitations the plaintiff alleges.  Insofar as the plaintiff contends that the RFC determination was erroneous because the ALJ did not credit her allegations of non-exertional limitations, the ALJ's determination is supported by substantial evidence.

## VII. <u>Conclusion</u>

For these reasons, the plaintiff's motion to reverse and/or remand the Commissioner's decision (doc. #14) is denied and the defendant's motion to affirm the decision of the Commissioner (doc. #15) is granted.

SO ORDERED at Hartford, Connecticut this 10th day of September, 2018.

_____/s/_____
Donna F. Martinez
United States Magistrate Judge